**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION**

LAWING FINANCIAL, INC.,
    a Kansas corporation,
6201 College Blvd., 7th Floor
Overland Park, KS 66211

                Plaintiff,

    v.

NADIA CAVNER,
4466 E. Culloden Lane
Springfield, MO 65809

and

The Nadia Cavner Group, LLC

Registered Agent May Be Served At:
8021 Forsyth Blvd.
St. Louis, MO 63105

                Defendants.

Case No. <u>15-cv-3164</u>

## <u>VERIFIED COMPLAINT</u>

Plaintiff Lawing Financial, Inc. ("Lawing"), brings this action against Defendant Nadia Cavner ("Cavner") and The Nadia Cavner Group, LLC ("Cavner Group") (collectively, "Defendants") for preliminary and permanent injunctive relief, as well as for damages, and alleges, upon knowledge with respect to itself and its own acts, and upon information and belief with respect to all other matters, as follows:

## INTRODUCTORY STATEMENT

1.        This lawsuit stems from Cavner's ongoing misconduct related to Defendants' sale to Lawing of the client relationships, good will, and other assets of Cavner and her business, Cavner Group.  As described herein, Cavner has breached her agreements with Lawing, misappropriated confidential client information, interfered with Lawing's client relationships, harassed Lawing's financial advisors and staff, and, among other things, wrongfully provided former clients with investment advice despite having been permanently barred by FINRA and has no current license to provide investment advice.  Cavner's active and ongoing misconduct is causing substantial and irreparable harm to Lawing.

2.        In approximately April 2013, Cavner, at that time a registered representative with Cambridge Investment Research, Inc. ("Cambridge") who had been acting as a financial advisor at BancorpSouth in Springfield, MO, formed Cavner Group, a Missouri limited liability company.

3.        As stated in Cavner Group's Articles of Organization, the purpose of the LLC was, among other things, to "[buy] and [sell] securities products."

4.        Cavner's formation of Cavner Group coincided with her plea of guilty to a felony charge of interstate stalking in Case # 2:13CR20135-JTF-01 in the Western District of Tennessee (the "Stalking Proceeding").

5.        In August 2013, judgment was entered against Cavner in the Stalking Proceeding, and she was sentenced to five years' probation, six months' home confinement, and four hours per month of community service for the first two years of her probation.

6.        As a result of her felony conviction, the Financial Industry Regulatory Authority ("FINRA")—with whom Cavner was a registered representative through her affiliation with

Cambridge—statutorily disqualified Cavner from her membership with FINRA via the Sec. Exch. Act of 1934, § 3.

7.     Cavner publically represented that she would attempt to overturn FINRA's statutory ban and continue selling securities, but in the fall of 2013, Cavner changed course. Around that time, she began to negotiate with Lawing a potential buy-sell of Cavner and Cavner Group's underlying assets, including their client relationships and good will of Cavner Group's trade name.

8.     During negotiations between Cavner and Lawing, Cavner repeatedly represented to Lawing that Defendants had approximately $400 million in assets under management ("AUM").

9.     In January 2014, Lawing entered into a Buy-Sell Agreement ("Buy-Sell") with Cavner and the Cavner Group (acting through Cavner as owner of the Cavner Group), pursuant to which Defendants agreed to sell, among other things, the ownership interest of the client relationships of Defendants; the trade name "The Nadia Cavner Group, LLC" and underlying good will associated with it; and Defendants' files, documents and other records of Clients and Accounts (the "Assets").

10.     In connection with the Buy-Sell, Cavner agreed to provide her best efforts to support and aid in the transfer of the assets, including the client relationships.

11.     In connection with the Buy-Sell, Cavner represented and warranted that all information provided by her and Cavner Group to Lawing regarding Clients and Accounts, which would include the AUM for those Clients and Accounts, was accurate.

12.     In connection with the Buy-Sell, Defendants agreed not to compete with Lawing for 18 months or solicit Lawing's acquired-clients for 60 months.

3

13.     Cavner also represented and warranted that she had disclosed to Lawing in writing all regulatory inquiries, investigations, enforcement actions, or administrative proceedings against her.

14.     For a limited duration and under limited conditions, Cavner was to assist Lawing in the transition of clients, primarily by introducing her former clients to their new financial advisors at Lawing.

15.     In connection with the Buy-Sell, Cavner additionally agreed to the Heightened Supervisory Plan which provided, among other things, that due to Cavner's statutory disqualification from FINRA arising from her felony conviction in the Stalking Proceeding, she was prohibited from the following:

> (A)     offering securities advice or affecting a securities transaction;
>
> (B)     affiliating with a FINRA member in any capacity and maintaining an office with a FINRA member;
>
> (C)      interacting with Clients without a Lawing registered representative present; and
>
> (D)     communicating anything directly or indirectly pertaining to Cavner's business and practice, the financial services industry, Lawing and its clients, her clients and others, for 18 months without Lawing's written consent.

16.     The Heightened Supervisory Plan also prohibited Cavner from having electronic access to client information, including such information on Cambridge systems or Lawing's CRM.

17.     The Heightened Supervisory Plan also prohibited Cavner from having management authority or control over any current or former employees or registered representatives of Cavner or Lawing.

18.     Since executing the above-referenced agreements, Cavner individually and through those under her direction and control has:

4

a)      breached numerous provisions of the Buy-Sell, by, among other things, failing to transfer ownership of the customer relationships and good will for which Lawing agreed to pay $3 million;

b)      breached the covenant of good faith and fair dealing implicit in the Buy-Sell;

c)      fraudulently misrepresented in writing the investigations and inquiries pending against Cavner, as well as the true value of her business;

d)      breached the terms of the Heightened Supervisory Plan;

e)      tortiously interfered with Lawing's future business expectancies and contractual relationships with clients and a former employee;

f)      misappropriated trade secrets of Lawing; and

g)      violated state and federal statutes concerning the unauthorized access of electronic information.

19.      Defendants' misconduct is active and ongoing.

20.      Accordingly, Lawing seeks injunctive relief from this Court to enforce Cavner's duties to Lawing and additional remedies to redress the damages inflicted.

## PARTIES

21.      Plaintiff Lawing Financial, Inc. is a Kansas corporation with its principal place of business in Overland Park, KS.

22.      Defendant Cavner is a citizen of Missouri who resides and may be served at 4466 E. Culloden Lane, Springfield, MO 65809.

23.      Defendant The Nadia Cavner Group, LLC is a domestic limited liability company formed under the laws of Missouri that may be served via its registered agent at 8021 Forsyth Blvd., St. Louis, MO 63105.

24.      Before entering into the Buy-Sell, Cavner Group's sole offices were located in Springfield, MO.

25.     Cavner is not a citizen or resident of the State of Kansas, so her citizenship is completely diverse from that of Lawing.

26.     Cavner Group's sole member is Cavner, so its citizenship is completely diverse from that of Lawing.

## JURISDICTION AND VENUE

27.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties, and the amount in controversy exceeds the sum or value of $75,000; and under 28 U.S.C. § 1331, because a federal question is presented.  Jurisdiction under the pendent state claims asserted in this action is founded under 28 U.S.C. § 1367(a).

28.     Venue in this District is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to these claims occurred in this District.

29.     Venue in this Division is proper pursuant to Local Rule 3.1(b) because Cavner resides in the Southern Division of the Western District of Missouri.

## FACTUAL BACKGROUND

### *Lawing's Business*

30.     Lawing is engaged in the highly competitive business of providing financial services to individuals throughout the United States.

31.     Cambridge serves as the broker-dealer for clients of Lawing to effectuate securities transactions on behalf of Lawing's clients.  Accordingly, financial advisors of Lawing are registered representatives of Cambridge.

### *The Nadia Cavner Group, LLC*

32.     Cavner owned and operated The Nadia Cavner Group, LLC in Springfield, Missouri, which provided financial services and advice to clients.

6

33.     Certain individuals worked for Cavner Group who were subsequently hired by Lawing.

34.     In connection with the Buy-Sell between Lawing and Cavner, Lawing was to acquire the Assets—including customer relationships—Cavner Group's trade name and the underlying good will associated therewith.  Lawing did not acquire ownership, operation or control of Cavner Group.

35.     Cavner Group is an active limited liability company according to the Missouri Secretary of State.

### Nadia Cavner

36.     In approximately November 1992, Cavner passed the Series 7 Examination, administered by FINRA, which granted her authority to conduct securities transactions on behalf of clients.

37.     Between approximately December 2001 and September 2005, Cavner worked at U.S. Bancorp Investments, Inc. ("USBI") as a financial consultant.

38.     On approximately September 2, 2005, Cavner left USBI to work for Signature Bank.

39.     On approximately September 8, 2005, USBI filed suit in the Western District of Missouri in Springfield (the "USBI Lawsuit") against Cavner.  Among other things, USBI alleged that Cavner, in connection with leaving USBI and joining Signature Bank, breached her Confidentiality and Non-Solicitation Agreement; tortiously interfered with USBI's business expectancy; and breached duties of loyalty and good faith to USBI.

40.     The USBI Lawsuit was briefly stayed as it proceeded in arbitration, but in November 2005, USBI sought to lift the stay in light of misrepresentations Cavner had made to the

District Court in connection with USBI's earlier hearing on its motion for temporary restraining order, which the Court had denied.

41.     On December 7, 2005, the Court held a show cause hearing with respect to USBI's request to lift the stay.  Thereafter, the Court ordered sanctions against Cavner for false representations made to the Court.  Cavner was ordered to pay $26,000 to USBI in attorneys' fees and $25,000 to the Clerk of the Court as a penalty.  The court held that it would have granted USBI's earlier request for a temporary restraining order against Cavner had Cavner been truthful.

42.     Thereafter, the USBI Lawsuit proceeded in arbitration.  In October 2006, the arbitration panel awarded USBI $325,000 in damages against Cavner, which was later confirmed by the Western District of Missouri in Springfield.

43.     Between September 2005 and January 2014, Nadia Cavner was affiliated with Cambridge as a registered representative of FINRA and licensed with the applicable state securities regulators as a securities agent with Cambridge.

44.     On approximately April 12, 2013, in the Stalking Proceeding in the United States District Court, Western District of Tennessee, Case No. 2:13-CR-20135-JTF-1, Cavner pleaded guilty to a felony under 18 U.S.C. § 2261(a) in connection with stalking and harassing her daughter's ex-boyfriend.

45.     On approximately August 23, 2013, judgment was entered against Cavner in the Stalking Proceeding.  She was sentenced to five years' probation, including six months of home confinement.  Cavner was also required to participate in four hours per month of community service for the first two years of her probation.

46.     As a consequence of her felony conviction, Cavner became statutorily disqualified from being registered with FINRA for a period of ten years from the date of her felony conviction.

47.     On October 17, 2013, Cavner was sued in Greene County, Missouri (Case No. 1331-CC01387) for civil claims in connection with Cavner's criminal stalking activities.

48.     On February 27, 2014, Cavner was suspended from associating with any FINRA member in any capacity for failing to respond to FINRA's Request for Information in connection with FINRA matter numbers 2013037030001 and 20130372218.

49.     On May 30, 2014, Cavner was permanently barred from associating with any FINRA member in any capacity pursuant to FINRA Rule 9552(h).

### *The Former Employee*

50.     On approximately January 16, 2014, Lawing hired a former employee ("The Former Employee") as an office administrative assistant.

51.     The Former Employee had previously worked for Defendants.

52.     The Former Employee worked for Lawing in both Springfield and from his dorm at the University of Missouri in Columbia.

53.     On or around January 16, 2014, The Former Employee acknowledged that he reviewed Lawing's presentation titled, "Compliance Discussion and Training RE: Nadia Cavner." *See* **Exhibit 1**.

54.     On February 1, 2014, The Former Employee signed a Non-Compete Agreement as a condition of his employment with Lawing.

9

55.      The Non-Compete Agreement (**Exhibit 2**) provides as follows:



**Non-Compete Agreement**

As a condition of my employment with Lawing Financial, Inc., I hereby agree that should my employment or affiliation with Lawing Financial, Inc. end that I will not maintain nor attempt to reestablish a FINRA membership or state securities registration for a period of eighteen (18) months following my termination of employment or affiliation with Lawing Financial, Inc. without written consent of Lawing Financial, Inc. Furthermore, I agree to not register as an Investment Adviser Representative with any advisory firm for a period of eighteen (18) months following my termination of employment or affiliation with Lawing Financial, Inc. without written consent of Lawing Financial, Inc. Furthermore, I agree to not maintain nor establish an Insurance Agent license/registration for a period of eighteen (18) months following my termination of employment or affiliation with Lawing Financial, Inc. without written consent of Lawing Financial, Inc.

Redacted
Employee Signature

2-1-2014
Date

Redacted
Employee Printed Name

56.      On February 1, 2014, The Former Employee signed a Non-Solicit Agreement as a condition of his employment with Lawing.

57.      The Non-Solicit Agreement (**Exhibit 3**) provides as follows:



**Non-Solicit Agreement**

As a condition of my employment with Lawing Financial, Inc., I hereby agree that should my employment or affiliation with Lawing Financial, Inc. end that I, or individuals controlled by or affiliated with me, will not solicit directly or indirectly a change of representative of record or a transfer from Lawing Financial, Inc.'s appointed registered individuals of any policy or account owned by a Client of Lawing Financial, Inc. nor serve as an insurance agent, registered representative, or investment adviser representative to any Client of Lawing Financial, Inc. or Account of such Client for a period of sixty (60) months following my termination of employment or affiliation with Lawing Financial, Inc.

Redacted
_____
Employee Signature

2-1-2014
_____
Date

Redacted
_____
Employee Printed Name

58.     On February 1, 2014, The Former Employee also signed a Privacy Attestation (**Exhibit 4**) that provided, among other things, that The Former Employee would not share any "nonpublic personal information" (as defined by the Attestation) with Nadia Cavner, unless specifically authorized in writing by Lawing.

59.     In connection with The Former Employee's hiring, on January 24, 2014, The Former Employee acknowledged in writing that he read and fully understood the contents of Lawing's Internet, E-Mail and Computer policy.  *See* **Exhibit 5**.

60.     At all relevant times described herein, The Former Employee was acting as an agent for Cavner under her direction and control, and Cavner knowingly directed The Former Employee to violate the terms of his agreements with Lawing.

61.     During his tenure with Lawing, The Former Employee had access to competitively sensitive business information of Lawing, including confidential financial information concerning clients of Lawing.

62.     Under Cavner's direction, control and authorization, and in violation of his agreements with Lawing, The Former Employee consensually provided Cavner with confidential information concerning clients of Lawing.

63.     Under Cavner's direction, control, and authorization, and in violation of his agreements with Lawing, The Former Employee consensually assisted Cavner in interfering with Lawing's relationships with its clients.

64.     The Former Employee resigned from Lawing on December 5, 2014.

65.     In connection with The Former Employee's resignation, Lawing reminded The Former Employee that he was required to return all client data/spreadsheets/reports and other nonpublic and personal information pursuant to The Former Employee's privacy attestation.

66.     The Former Employee failed to return all of the required confidential information, and he retains confidential information of Lawing at the present.

67.     His conduct in violation of his agreements and in concert with Cavner continued after his resignation.

68.     On January 27, 2015, counsel for Lawing sent The Former Employee a cease and desist letter demanding that The Former Employee return all originals and copies of Lawing's confidential information.  *See* **Exhibit 6**.

69.     Since receiving the cease and desist letter, The Former Employee has continued to refuse to provide Lawing access to his laptop computer and other electronic devices for inspection.

### *Lawing and Cavner Negotiate and Enter into the Buy-Sell*

70.     In the fall of 2013, Cavner began to discuss with Lawing a potential buy-sell of the Assets.

71.     Throughout negotiations, Cavner repeatedly represented that Defendants had AUM of $400 million.

72.     Lawing reasonably relied upon Cavner's representations concerning Defendants' AUM.

73.     After closing on the Buy-Sell, Lawing discovered that Defendants' AUM was much less than Defendants had represented—approximately $291 million rather than $400 million.

74.     Lawing further discovered that approximately $50 million of the $291 million stayed with BancorpSouth and did not transfer to Lawing.

75.     Accordingly, Defendants intentionally and knowingly misrepresented their AUM by approximately $160 million.

76.     In January 2014 Defendants entered into the Buy-Sell with Lawing, pursuant to which Lawing was to acquire the Assets, including Defendants' customer relationships and Cavner Group's underlying good will.  (A true and correct copy of the Buy-Sell is attached hereto as **Exhibit 7**.)

77.     The Buy-Sell was fully executed on January 10, 2014.

78.     The purchase price under the Buy-Sell is $3,000,000.00.

79.     The $3,000,000.00 purchase price was based in part upon Defendants' intentional misrepresentations that their AUM equaled $400 million.

80.     The purchase price is to be paid through a phased five year acquisition plan.

81.     Lawing remitted a cashier's check to Cavner in the amount of $1,000,000.00 on January 13, 2014.

82.     Lawing has paid Cavner $1,000,000.00 to date under the Buy-Sell.

83.     The next payment under the Buy-Sell is due in July 2015.

84.     The Buy-Sell gives Lawing the right to reduce the Buy-Sell's purchase price dollar for dollar by the amount of damage, including attorneys' fees, that arises directly or indirectly from or in connection with any breach, resulting from Cavner's intentional misrepresentation, fraud or gross negligence, of any representation or warranty made by Cavner in the Buy-Sell or within any other document or otherwise made available to Lawing by Cavner or any breach by Cavner of any obligation or covenant under the Buy-Sell.

85.     The Buy-Sell further gives Lawing the right—on the Re-Evaluation date in July 2015—to reevaluate the purchase price should it retain less than 70% of the AUM represented by Cavner.

86.     The Buy-Sell contains a Non-Solicit provision that pertains to Defendants ("Seller"), which provides the following:

> **Non-Solicit.** In exchange for Buyer's purchase, for sixty (60) months following the Closing Date, Seller/Seller's Estate and/or entities or individuals controlled by or affiliated with Seller will not solicit directly or indirectly a change of representative of record or a transfer from Buyer's appointed registered individuals of any policy or account owned by a Client nor serve as an insurance agent, registered representative or investment adviser representative to any Client or Account. Seller, within fifteen (15) days following the Closing date, will direct CIR to withdraw its' FINRA MEMBERSHIP CONTINUANCE APPLICATION "MC-400" relating to the Seller and promptly provide evidence of such direction to Buyer.

87.     The Buy-Sell also contains a Non-Compete provision, which provides the following:

> **Non-Compete.** Seller agrees to not maintain nor attempt to reestablish a FINRA membership/registration for eighteen (18) months following the closing date without written consent of Buyer. Seller agrees to not register as an Investment Adviser Representative with any advisory firm for eighteen (18) months following the closing date without written consent of Buyer. Seller agrees to not maintain nor establish an Insurance Agent license/registration for eighteen (18) months following the closing date without written consent of Buyer.

88.     The Buy-Sell contains Representations & Warranties of Cavner, which provides, among other things, that Cavner disclosed all regulatory inquiries, investigations, enforcement

14

actions, or administrative proceedings to Lawing in writing as of the date of execution of the Buy-Sell.

89.     With respect to the Representations & Warranties mandated by the Buy-Sell, Cavner provided the following:



I am indirectly aware of a currently pending FINRA Member Regulation--rather than Enforcement Division--investigation that appears to relate to me. I am not aware of the specifics or boundaries of the investigation. I am also not aware of any customer complaint at issue in the investigation. The investigation began after my guilty plea in federal court in 2013. This investigation may or may not be related to CIR's application regarding me pending before the NAC, although it certainly appears to be.

You are already aware of the McFarland civil suit referenced in the Agreement.
My attorney is having discussions with the State of Arkansas Securities Division regarding my application for registration in that state. I intend to have CIR withdraw that application as well as the MC-400 application within 15 days after the Closing Date.

I am not aware of any other complaints, suits or investigations.

Nadia T. Cavner

1-9-2014
Date

90.     At the time of Cavner's Representations & Warranties, reprinted above, Cavner was aware of but failed to disclose that FINRA had two open investigations concerning her conduct pending since at least July 2013.  It appears that FINRA had already requested information and documents from Cavner, including a request for her on-the-record testimony ("OTR").

91.     The Buy-Sell contains the following indemnification provisions:

b. Seller shall hold harmless and indemnify Buyer from any judgment, damage, including attorney fees, which are directly or indirectly suffered or incurred by Buyer and arising directly or indirectly from or in connection with any of the following:

   i. any breach, resulting from Seller's intentional misrepresentation, fraud or gross negligence, of any representation or warranty made by Seller in this Agreement or any other document delivered or otherwise made available to Buyer;

   ii. any breach by Seller of any obligation or covenant under this Agreement;

   iii. any ongoing or future civil suit in which Seller is named or is a party to, but which is not related to Seller's prior financial services activities or investment recommendations, including but not limited to, the matter of Patrick McFarland ET AL V Nadia Cavner ET AL [Missouri Case Number 1331-CC01387]; and

   iv. any complaint, regulatory investigation or proceeding, arbitration or lawsuit initiated by Client or a securities regulator regarding Seller's activities or investment recommendations.

### *Cavner's Ongoing Misconduct*

92.     Since January 2014, Cavner individually and/or through individuals under her direction and control, has failed to provide Lawing the benefit of its bargain with Defendants by, among other things: failing to fully transfer the customer relationships Lawing purchased; interfering with customer relationships, future business expectancies and Lawing's agreements with The Former Employee; denying Lawing the good will associated with its purchase of the Assets; breaching her Agreements with Lawing; providing unauthorized investment advice; harassing Lawing financial advisors and staff; and accessing, misappropriating and maintaining confidential Lawing information.

93.     On approximately January 29, 2014, Cavner attested that she had received and understood the Heightened Supervisory Plan dated January 15, 2014 that lists the compliance controls that Lawing and Cambridge implemented in connection with the Buy-Sell and with respect to Cavner's interaction with Lawing, Cambridge and Lawing's clients.

94. The aforementioned Heightened Supervisory Plan and Cavner's related attestation are attached hereto as **Exhibit 8**.[1]

95. Among other things, the Heightened Supervisory Plan provides that Cavner will not have any electronic access to Cambridge's systems, client information, or Lawing's CRM. Cavner is also prohibited from offering securities advice or affecting a securities transaction, and any interaction with her former clients must be in the presence of Lawing registered representatives who were not previously affiliated with Cavner Group.

96. The Heightened Supervisory Plan additionally provides that Cavner's employees and representatives—including the Former Employee—must change their access passwords to all Cambridge systems once Lawing assumed control and oversight of Cavner's client relationships, which included not only communications with and providing investment advice to the clients, but also access to client accounts, records and statements. Moreover, Cavner is prohibited from having management authority or control over any current or former employees or registered representatives of Cavner or Lawing (Cavner's duties pursuant to the Heightened Supervisory Plan are collectively referred to hereafter as "Plan Duties").

97. Following the closing on the Buy-Sell in January 2014, Lawing's financial advisors began to meet with Cavner's former clients to discuss and plan the clients' investment strategies.

98. Cavner assisted in making certain introductions between her former clients and Lawing's financial advisors.

99. During such introductions and any other interaction with her former clients, she was bound by the Plan Duties.

---

[1] The Heightened Supervisory Plan and Buy-Sell are referred to collectively as the "Cavner Agreements."

100.     Immediately following the Buy-Sell's closing, however, Cavner began to breach her Plan Duties.

101.     Specifically, on or around February 14, 2014, Cavner met a client of Lawing's ("The High-Asset Customer") in-person in Montana without a Lawing registered representative present and without informing Lawing.

102.     In connection with her meeting with The High-Asset Customer, Cavner persuaded him, on February 14, 2014, to sign a General Power of Attorney for Cavner to be his attorney-in-fact, thereby giving her the power to "execute, amend or revoke any trust agreement;" and "to fund with my assets any trust not created by me," among other things.   On that same day, Cavner also persuaded him to assign her as successor trustee to his revocable trust.

103.     On approximately September 26, 2014, Cavner met with The High-Asset Customer for the purpose of having him sign documents that ultimately sought to transfer control of several of his accounts—and information concerning those accounts—to Cavner.

104.     On or around October 2014, Cavner began renting office space in Springfield, Missouri.

105.     The office space is directly across the street from the space previously occupied by Cavner Group and then occupied by Lawing.

106.     Between October 2014 and continuing to the present, multiple Lawing clients, on nearly a daily basis, arrive at Cavner's new office space and meet with Cavner to discuss their investments.

107.     In October 2014, after a client of Lawing had agreed to establish a fee-based investment account upon Lawing's recommendation, Cavner attempted to rescind the establishment of that account by demanding that a Lawing representative effectuate the rescission.

108.     Prior to requesting the above-mentioned rescission, Cavner, in breach of her Plan Duties, provided investment advice to the client and met with the client without a Lawing registered representative present.

109.     Throughout the fall of 2014 and continuing to the present, multiple Lawing clients contacted Lawing and represented that Cavner was providing them with investment advice. These clients and others also represented that Cavner had told them she would be "getting back in the business."

110.     Throughout the fall of 2014 and continuing to the present, multiple Lawing clients contacted Lawing after agreeing to establish a fee-based investment account and requested that such account be rescinded. These Lawing clients requested the rescissions upon Cavner improperly providing them with investment advice.

111.     In January 2015, clients of Lawing instructed Lawing in writing to "void [any pending transactions] at once." Such instruction was given at Cavner's advice and direction.

112.     The same clients also provided Cavner with a large check to Cavner at her newly-established offices. When Lawing retrieved the check from Cavner's offices as the clients instructed, the envelope contained detailed investment instructions written by Cavner.

113.     Throughout the fall of 2014 and continuing to the present, numerous Lawing clients have requested online access to view the status and details of their investment accounts. Multiple clients have represented that Cavner asked the client to request the online access so that Cavner could view and improperly provide investment advice with respect to the accounts.

114.     Investment statements for at least one client of Lawing are also being sent to Cavner's home address.

115.     On January 22, 2015, another high-asset client of Lawing granted Cavner a limited durable power of attorney to, among other things "manage my accounts I may have with Lawing Financial ("Lawing"), including but not limited to making investments for me through Lawing, authorizing the sale of any investments I have with Lawing, transferring money from one Lawing account to the other, signing any and all documents necessary to invest, sell and/or transfer money held by Lawing, and communicating with any and all personnel employed by or associated with Lawing."

116.     Throughout the fall of 2014 and continuing to the present, Cavner has repeatedly harassed Lawing financial advisors and staff through phone calls, emails, text messages and in-person meetings with investment instructions for numerous Lawing clients.  Cavner has repeatedly badgered a Lawing financial advisor to leave Lawing and "go out on his own" and has sought to induce this defection by suggesting opportunities he would have with existing Lawing clients over whom she is exerting influence.

117.     In March 2015, Cavner attempted to direct Lawing to withdraw more than $250,000 from one of The High-Asset Customer's accounts.

118.     In April 2015, multiple clients called Lawing to request Cavner's contact information to speak with Cavner in response to Cavner sending cards to Lawing's clients.

119.     In April 2015, a Lawing client met with Cavner at her new offices.  Immediately following that meeting, the client met with a Lawing financial advisor and requested online access to her investment statements.  The customer represented that Cavner had requested the access.  After Lawing's meeting with the client, Cavner sent a text message to the Lawing financial advisor stating "Planning to KILL you!" because she was angry that the client had asked her about her communications with the advisor.

20

120.     In April 2015, two Lawing clients, who are husband and wife, sought to rescind an existing fee-based investment account based on Cavner's investment advice. Lawing's financial advisor then re-explained the benefits of a fee-based account to the clients, and the clients changed their minds. Cavner then induced the clients to rescind the fee-based account. Thereafter, the clients then returned to their initial rescission demand of the fee-based account. Lawing's financial advisor made a presentation to the clients regarding their investments and the best course of action for their investments. The clients were reluctant to listen to Lawing, admitting that they had spoken with Cavner about their investments.

121.     In April 2015, a Lawing client based in Texas represented to Lawing that Cavner was coming to Texas to visit with him about his investment portfolio.

### Cavner's Misappropriation of Confidential Information

122.     At the time of the Buy-Sell's closing date, certain confidential customer and financial data of the clients Lawing was to acquire resided on the Redtail CRM, a web-based client management solution system designed by Redtail Technology. The customer and financial data on the Redtail CRM was accessible only with a user name and password.

123.     On or around January 10, 2014, Cavner relinquished her access and ownership of the Redtail database and transferred such access and ownership to Lawing.

124.     In violation of her obligations under the Cavner Agreements and her relinquishment of ownership, Cavner or individuals under Cavner's direction, control and authorization, including The Former Employee, repeatedly accessed confidential client information on Redtail CRM after January 14, 2014.

125.   For example, on February 5, 2014, Cavner or individuals under her direction, control and authorization logged into the Redtail CRM five times between 6:09 p.m. and 11:29 p.m.

126.   Similarly, on February 6, 2014, Cavner or individuals under her direction, control and authorization logged into the Redtail CRM seven times between 3:41 p.m. to 10:22 p.m.

127.   Over the following months, Cavner or individuals under her direction, control and authorization logged into the Redtail CRM and accessed confidential customer information more than fifty times.

128.   The Former Employee, under Cavner's direction, control and authorization, provided Cavner with confidential client information obtained from the Redtail CRM and Lawing's systems while employed by Lawing.

129.   On December 2, 2014, Lawing confirmed receipt of The Former Employee's letter of resignation and requested that The Former Employee return all company property and information pursuant to his Privacy Attestation dated February 1, 2014.

130.   The Former Employee responded, "I'll be happy to give you everything I have on my laptop & the few physical copies I have here."

131.   The Former Employee returned certain physical copies of documents as well as a portable drive containing certain electronic data, including files named "redtail," from at least one laptop.

132.   Review of the portable data revealed The Former Employee created reports on various Lawing clients, including The High-Asset Customer, which were not requested by Lawing and for no discernable business purpose.

133.   The Former Employee provided these reports to Cavner.

134.     Cavner directly contacted Redtail on at least one occasion and attempted to secure access to information on accounts for which she was not—nor could be—the registered representative.  Cavner falsely represented to Redtail that she had never heard of the Lawing record owner identified to her by Redtail.

135.     In January 2015, a customer called a registered representative of Lawing and expressed concern that Cavner had asked for copies of the customer's statements.

136.     Cavner is accessing CIR Statements as well as vendor to obtain information on holdings of Lawing clients.

137.     Cavner has confidential client information and numerous client files at her office stored in at least two large file cabinets that has client information organized alphabetically.

138.     Cavner has informed several clients of Lawing that she will be "back in the business pretty soon."

139.     The above-described actions of Cavner separately and collectively violate her contractual and common law duties to Lawing.

## Count I – Injunctive Relief

140.     Lawing hereby incorporates each and every previous paragraph as if fully set forth herein.

141.     There is a substantial likelihood that Lawing will prevail on its claims as set forth herein and as more fully explained in its Motion for Preliminary Injunction and Suggestions in Support, which is forthcoming.

142.     Unless the requested preliminary injunction and permanent injunction are issued, Lawing will continue to suffer irreparable harm due to Cavner's breach of the Cavner Agreements,

her interference with customers, her harassing of Lawing and her wrongful maintenance of confidential information.

143. Lawing's clients will be continue to be wrongly misled and diverted by Cavner if Cavner is not preliminarily and permanently enjoined.

144. Clients also are likely to be confused by Cavner's providing investment advice and telling clients that she will be back in the business, despite the fact that she is permanently barred by FINRA and has no current license to provide investment advice.

145. Any harm to Cavner or others would be minimal in comparison to the harm that Lawing will suffer if the injunctive relief is not granted.

146. Public policy will be served by the entry of the requested injunctive relief as it will promote the public policy of enforcing contractual rights and obligations and preventing a permanently barred, former registered representative from confusing and manipulating clients of Lawing.

WHEREFORE, Lawing prays that this Court enter a preliminary injunction and permanent injunction enjoining Cavner, and those acting in concert with her (a) from violating the terms of the Cavner Agreements and from inducing The Former Employee to violate his agreements with Lawing; (b) from providing investment advice to any individuals; (c) from soliciting, recruiting, communicating with and serving restricted clients regarding their investments; (d) from diverting Lawing's customers away to Cavner's planned business; (e) from meeting with clients; and (f) from using any trade secrets and confidential information Cavner possess, and requiring Cavner to return all such information to Lawing.

## **Count II – Breach of Contract – Buy-Sell and Heightened Supervisory Plan**

147.    Lawing hereby incorporates each and every previous paragraph as if fully set forth herein.

148.    Cavner made valid agreements with Lawing: the Buy-Sell and related Heightened Supervisory Plan.

149.    The Cavner Agreements both were supported by sufficient consideration, including, but not limited to, Lawing's payments to Cavner of $1,000,000.00 and conditional promise to pay her an additional $2,000,000.00 over five years.

150.    Lawing performed all of its material obligations under the Cavner Agreements and has otherwise complied with the terms of the Cavner Agreements.

151.    Cavner has breached her Agreements with Lawing by, among other things, making false representations and warranties to Lawing concerning her knowledge of ongoing regulatory inquiries; by failing to transfer the customer relationships for which Lawing paid a substantial amount; by failing to provide the good will associated with the trade name of Cavner Group for which Lawing paid a substantial amount; by failing to transfer all client records; by competing with and soliciting clients of Lawing; by communicating with former clients without Lawing present and without Lawing's permission; by providing investment advice to former clients; and by misappropriating confidential client information.

152.    Cavner's breach of the Cavner Agreements is material.

153.    Lawing has been and will continue to be damaged as a direct result of Cavner's breaches, in an amount to be proved at trial.

154.    Lawing additionally has been and will continue to be irreparably damaged as a direct result of Cavner's breaches.

## Count III – Breach of Implied Covenant of Good Faith and Fair Dealing

155.     Lawing hereby incorporates each and every previous paragraph as if fully set forth herein.

156.     Defendants had a duty to exercise judgment conferred by the express terms of the Buy-Sell in such a manner so as to not evade the spirit of the transaction or deny Lawing the expected benefits of the Buy-Sell.

157.     Defendants had a duty to not intentionally do anything to prevent Lawing from carrying out its part of the agreement, or do anything which would have the effect of destroying or injuring Lawing's right to receive the fruits of the contract, including unfettered customer relationships and the underlying good will of Cavner Group.

158.     Defendants breached that duty by engaging in the conduct described herein, which constituted bad faith and/or unfair dealing.

159.     Defendants' conduct has denied Lawing the benefit of its bargain with respect to the Buy-Sell.

## Count IV – Fraudulent Misrepresentation

160.     Lawing hereby incorporates each and every previous paragraph as if fully set forth herein.

161.     In connection with execution of the Buy-Sell, Cavner warranted and represented that she was "indirectly aware of a currently pending FINRA Member Regulation—rather than Enforcement Division—investigation that appears to relate to me.  I am not aware of the specifics or boundaries of the investigation."  *See* **Exhibit 7**.

162.     At the time Cavner made this material representation, FINRA had two concurrent investigations of Cavner underway, case numbers 2013037030001 and 20130372218.

163. Those investigations had been ongoing since at least July 2013.

164. Only approximately one month after Cavner's representation, she was sent a Notice of Suspension for failing to provide information to FINRA that FINRA had requested prior to Cavner's representations to Lawing.

165. Approximately three months later, Cavner was permanently barred from the industry for failing to respond to FINRA's inquiry.

166. Cavner also represented that Defendants had approximately $400 million in AUM upon the closing of the Buy-Sell.

167. Cavner's representations to Lawing were false at the time they were made.

168. Cavner had knowledge of the falsity of the representations at the time they were made in light of the extent and seriousness of the FINRA investigations and the numerous times she insisted on the $400 million AUM figure's accuracy.

169. Cavner intended that Lawing act upon her representations.

170. Lawing was unaware of the falsity of Cavner's representations.

171. Lawing relied on the truth of Cavner's representations and had a right to do so.

172. Lawing was damaged as a direct result of its reasonable reliance on Cavner's false representations.

## Count V – Fraudulent Inducement

173. Lawing hereby incorporates each and every previous paragraph as if fully set forth herein.

174. In connection with the execution of the Cavner Agreements, Cavner made numerous material representations, including, among other things, that she would refrain from the following: communicating with her former clients; providing investment advice; soliciting former

27

clients; competing with Lawing; accessing client information; and having authority or control over any current or former employees, including The Former Employee.

175.     Cavner also falsely represented that Defendants had approximately $400 million in AUM upon the closing of the Buy-Sell.

176.     Cavner's representations were false at the time they were made.

177.     Cavner had knowledge of the falsity of the representations at the time they were made given the frequent and numerous acts of misconduct—including but not limited to her visit with a Lawing client in February 2014—that began occurring shortly after the Cavner Agreements were made and continuing to the present.  Cavner's knowledge of the falsity of the representations is also evident in the numerous times she insisted on the approximately $400 million AUM figure's accuracy.

178.     Cavner intended that Lawing act upon her representations.

179.     Lawing was unaware of the falsity of Cavner's representations.

180.     Lawing relied on the truth of Cavner's representations and had a right to do so.

181.     Lawing was damaged as a direct result of its reasonable reliance on Cavner's false representations.

## Count VI – Tortious Interference with Contract

182.     Lawing hereby incorporates each and every previous paragraph as if fully set forth herein.

183.     Lawing has valid contractual relationships with its clients.

184.     Lawing has valid contractual relationships with The Former Employee.

185.     Cavner has knowledge of Lawing's contractual relationships with its clients in that Cavner, pursuant to the Buy-Sell, promised to sell Lawing the ownership interest of her client relationships.

186.     Cavner has knowledge of The Former Employee's contractual relationships with Lawing in that The Former Employee worked for Defendants immediately prior to working for Lawing and regularly communicated with Cavner throughout his transition from Cavner Group to Lawing and into the present.

187.     Cavner, by her actions described above, including but not limited to wrongfully obtaining confidential customer data, communicating with Lawing's clients about their investments without Lawing's permission, providing financial advice and diverting funds from Lawing's clients' accounts, has intentionally interfered with and breached Lawing's contractual relationships with multiple clients and The Former Employee.

188.     Cavner's interference is for an improper purpose.  Among other things, Cavner is improperly undermining Lawing's client relationships in an effort to maintain control and influence over her former clients, which is prohibited not only by her agreements with Lawing, but also by regulations.  Cavner therefore lacks justification for her actions.

189.     Lawing has suffered damages as a direct and proximate cause of Cavner's unlawful conduct.

### Count VII – Tortious Interference with Business Expectancy

190.     Lawing hereby incorporates each and every previous paragraph as if fully set forth herein.

191.     With respect to its clients, Lawing has a valid business expectancy in that Lawing provides its clients with financial and investment advice on an ongoing basis.

192.     Cavner has knowledge of Lawing's business expectancy in that Cavner, pursuant to the Buy-Sell, promised to sell Lawing the ownership interest of her client relationships

193.     Cavner, by her actions described above, including but not limited to wrongfully obtaining confidential customer data, communicating with Lawing's clients, providing financial advice, inducing Lawing's clients to request changes to their investment portfolios and diverting funds from Lawing's clients' accounts, has intentionally interfered with and breached Lawing's business expectancy with multiple clients.

194.     Cavner's interference is for an improper purpose.  Among other things, Cavner is improperly undermining Lawing's client relationships in an effort to maintain control and influence over her former clients, which is prohibited not only by her agreements with Lawing, but also by regulations.  Cavner therefore lacks justification for her actions.

195.     Lawing has suffered damages as a direct and proximate cause of Cavner's unlawful conduct.

## Count VIII – Misappropriation of Trade Secrets in Violation of the Missouri Uniform Trade Secrets Act, RSMo § 417.450 *et seq.*

196.     Lawing hereby incorporates each and every previous paragraph as if fully set forth herein.

197.     To service client accounts effectively and properly, Lawing owns and maintains extensive client records, in hard copy form and in computer databases.  The client records and the databases housing those records contain confidential financial and historical information regarding Lawing's clients, including customer identities, telephone numbers, transactional histories, tax information, personal financial data, banking information and investment objectives, among other data ("Lawing's Client Records").

198.     Under Subtitle A of Title V of the Gramm-Leach-Bliley Financial Modernization Act of 1999 ("GLB"), a financial institution must not disclose nonpublic personal information about a customer to non-affiliated third-parties unless the financial institution (1) has provided the customer with notice of its privacy policies and practices and (2) afforded the customer an opportunity to "opt-out" of the policy, thereby prohibiting disclosures to non-affiliated third parties.

199.     Regulation S-P, adopted by the Securities and Exchange Commission in 2000, implements GLB for the "financial institutions" regulated by the SEC.  *See* 17 C.F.R. Part 248.

200.     GLB and Regulation S-P prohibit the disclosure of "nonpublic personal information" which includes personally identifiable financial information (i) provided by the consumer to the financial institution; (ii) resulting from any transaction with the consumer or any service performed for the consumer; or (iii) otherwise obtained by the financial institution. 15 U.S.C. § 6809(4)(A).  Nonpublic personal information also includes any list or group of consumers and publicly available information pertaining to them that is derived using nonpublic personal information.  15 U.S.C. § 6809(4)(C)(i).  A financial institution may avoid this wholesale prohibition only by notifying its customers of a different policy and providing its customers with the opportunity to "opt-out."

201.     Lawing is required to adhere to GLB and Regulation S-P.

202.     Accordingly, Lawing has an obligation under GLB and Regulation S-P to maintain the confidentiality of its Client Records.

203.     To comply with the above-referenced federal regulations, Lawing imposes restrictions on the removal of its client information and records to ensure that those records remain confidential.

31

204.     Lawing's Client Records are not available from other sources and have been created and updated over a period of years based on Lawing's relationship with its clients. Lawing's clients demand that such information be kept confidential and provide such information based on Lawing's express and implied assurances that it will keep the information and data confidential.

205.     After execution of the Cavner Agreements and in violation of her Agreements, Cavner misappropriated Lawing's Client Records.

206.     Lawing's Client Records include technical and nontechnical data that derives independent economic value from not being generally known to and not readily ascertainable by proper means by other persons.  The information is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

207.     Lawing protects its trade secret information by, among other methods, not disclosing it publicly, holding the trade secrets in a secure manner and taking reasonable steps to prevent unauthorized access or use of the information by unauthorized persons.

208.     Cavner used and disclosed the trade secrets in her possession without Lawing's express or implied consent.

209.     As a result of Cavner's misappropriation of Lawing's trade secrets, Lawing has suffered and will continue to suffer harm, including actual loss.

210.     Cavner's misappropriation of Lawing's trade secrets was willful and malicious, and justifies the award of exemplary damages.

### Count IX – Unjust Enrichment

211.     Lawing hereby incorporates each and every previous paragraph as if fully set forth herein.

212.     Cavner was unjustly enriched because she neither transferred the client relationships or the good will as required after having been paid $1,000,000.00.

213.     Cavner was unjustly enriched because she wrongfully misappropriated confidential client information, including trade secrets, after being paid $1,000,000.00.

214.     Cavner appreciated the benefits conferred on her.

215.     Cavner has no valid legal or equitable claim to Lawing's trade secrets and confidential information or any financial benefit she has derived from them.

216.     Cavner's acceptance and retention of her benefits was at the expense of Lawing for the reasons described herein.

217.     Cavner's retaining her benefits would be unjust in light of the misconduct described herein.

### Count X – Violation of RSMo § 569.095, Tampering with Computer Data

218.     Lawing hereby incorporates each and every previous paragraph as if fully set forth herein.

219.     Cavner or others (acting as Cavner's agent), without authorization and without reasonable grounds to believe that they had authorization, knowingly disclosed and took data and supporting documentation residing and existing on the Redtail CRM.

220.     Cavner or others (acting as Cavner's agent), without authorization and without reasonable grounds to believe that they had authorization, knowingly accessed the Redtail CRM and intentionally examined confidential information concerning Lawing's clients.

221.     As a result of Cavner's violation of RSMo § 569.095, Lawing has suffered and will continue to suffer harm, including actual loss.

33

222.     Pursuant to RSMo § 537.525, Lawing is entitled to compensatory damages and reasonable attorneys' fees.

### Count XI – Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2)

223.     Lawing hereby incorporates each and every previous paragraph as if fully set forth herein.

224.     Lawing is a "financial institution" as defined in the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030(e)(4).

225.     A "financial record" is defined in the CFAA to include "information derived from any record held by a financial institution pertaining to a customer's relationship with the financial institution." 18 U.S.C. § 1030(e)(5).

226.     The CFAA expressly prohibits the unauthorized access of a computer, or access that exceeds the scope of authorization, to obtain financial records of a financial institution. 18 U.S.C. § 1030(a)(2)(A). As used in the CFAA, "computer" includes not only the computer itself, but also "any data storage facility . . . directly related to or operating in conjunction with" a computer. 18 U.S.C. § 1030(e)(1).

227.     Lawing's Client Records constitute "financial records" under the CFAA.

228.     Lawing's Client Records, maintained previously on the Redtail CRM and currently on Lawing's CRM, reside on "computers," as defined by the CFAA.

229.     Cavner or others (acting as Cavner's agent), without authorization and without reasonable grounds to believe that they had authorization, accessed and obtained Lawing's Client Records existing on the Redtail CRM and Lawing's CRM.

230.     As a result of Cavner's and her agent's actions, Lawing has suffered and will continue to suffer harm, including actual loss.

34

## Count XII – Declaratory Judgment

231.    Lawing hereby incorporates each and every previous paragraph as if fully set forth herein.

232.    Lawing requests that this Court issue a declaratory judgment declaring that Cavner materially breached the Buy-Sell and Heightened Supervisory Plan; that Cavner breached her duty of good faith and fair dealing implicit in the Buy-Sell; that Lawing has no obligation to make further payments under the Buy-Sell; and that Lawing is entitled to restitution from Cavner in an amount equal to $1,000,000.00 (the amount paid by Lawing to date).

233.    An actual controversy exists between the parties in that Cavner's misconduct as described herein presents a presently-existing dispute regarding Lawing's legally protectable interests arising from the Buy-Sell and Heightened Supervisory Plan.

234.    The controversy at issue is ripe for judicial determination in that all of the facts set forth above are sufficient to permit this Court to make a determination and to resolve the conflict at hand in a conclusive manner.

235.    Lawing does not have an adequate remedy at law that would govern Cavner's future behavior of wrongful and persistent interference with Lawing's clients and breach of the Cavner Agreements.

## Attorney's Fees

236.    As a result of Cavner's wrongful actions described above, Lawing retained counsel to prosecute these claims.

237.    Lawing is, therefore, entitled to recover reasonable and necessary attorneys' fees and costs incurred in the prosecution of this lawsuit pursuant to the terms of the Buy-Sell as well as pertinent statutory provisions.

35

## Prayer for Relief

WHEREFORE, Lawing respectfully requests and prays for judgment against Cavner as follows:

1.      Preliminarily and permanently ordering specific performance of Cavner's contractual obligations to Lawing;

2.      Preliminarily and permanently enjoining Cavner and all persons in active concert or participation with her from violating the terms of the Cavner Agreements;

3.      Preliminarily and permanently ordering Cavner to cease and desist from using and disclosing all confidential information and trade secrets of Lawing, and to immediately return all such information and trade secrets to Lawing;

4.      Preliminarily and permanently ordering Cavner to cease and desist from interfering with Lawing's client and contractual relationships, including meeting with clients and discussing investments with clients, and from harassing Lawing;

5.      Ordering Cavner to pay back to Lawing the $1,000,000.00 she has unjustly received and retained;

6.      Relieving Lawing of any future payment obligations under the Buy-Sell;

7.      Awarding Lawing appropriate damages, including exemplary damages and damages for Cavner's unjust enrichment;

8.      Awarding Lawing its costs and attorneys' fees; and

9.      Awarding Lawing such other and further relief as the Court deems just and proper.

## JURY DEMAND

Lawing demands a jury trial on all claims so triable.

DATED:  April 15, 2015

Respectfully submitted,

**BERKOWITZ OLIVER WILLIAMS**
**SHAW & EISENBRANDT LLP**

By: _____
     John W. Shaw (MO Bar #26205)
     John S. Kemp (MO Bar #62999)
     jshaw@berkowitzoliver.com
     jkemp@berkowitzoliver.com
     2600 Grand Boulevard Suite 1200
     Kansas City, Missouri  64108
     Telephone:  (816) 561-7007
     Facsimile:  (816) 561-1888

     *Attorneys for Lawing Financial, Inc.*

# AFFIDAVIT OF ANTHONY WOODARD

STATE OF KANSAS       )
                             )
COUNTY OF JOHNSON    )

ANTHONY WOODARD, having been first duly sworn, states as follows:

1.    I am over the age of 18 years, and I am competent to attest to the facts verified by this Verification;

2.    I am currently the Managing Director of Compliance and Enterprise Level Risk Management for Lawing Financial, Inc. and am authorized to execute this Verification on Lawing's behalf;

3.    I have reviewed the facts in Lawing's Verified Complaint and such facts are true and accurate to the best of my knowledge, information and belief.

FURTHER AFFIANT SAYETH NOT.

_____
Anthony Woodard

Subscribed and sworn to before me this 15th day of April 2015.

_____
Notary Public

My commission expires:

_____
8/12/2017

NOTARY PUBLIC - - State of Kansas
DAYNA L. KELLY
My Appt. Exp. 8-12-2017